UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

DONALD SALZBERG,

Defendant.

Criminal No. 22cr10122

Violations:

Count One: Conspiracy to Commit Health Care Fraud
(18 U.S.C. § 1349)

Count Two: Conspiracy to Violate the Anti-Kickback Statute
(18 U.S.C. § 371)

Forfeiture Allegation:
(18 U.S.C. § 982(a)(7))

FILED IN CLERKS OFFICE 2022 MAY 23 AM 10: 27

INFORMATION

At all times relevant to this Information:

GENERAL ALLEGATIONS
*The Defendant*

1. Defendant DONALD SALZBERG was a 67-year-old resident of Avon, Connecticut. SALZBERG owned and operated Donald J. Salzberg, M.D., an ophthalmology practice in West Hartford, Connecticut. SALZBERG has been licensed as a medical doctor in the State of Connecticut for 36 years.

*Coconspirator Company Manager*

2. Coconspirator Company Manager ("CC-1") was the head salesperson for a medical diagnostics company ("TCD Company") that employed technicians to perform transcranial Doppler ("TCD") scans in eye doctors' offices. CC-1 paid bribes on behalf of the TCD Company to induce eye doctors to order TCD tests that TCD Company submitted to Medicare and other insurance companies for payment based on fraudulent diagnoses.

*The Medicare Program*

3. Medicare is a federally funded health care program providing benefits to persons who are 65 years of age or older or disabled. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), administers Medicare. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

4. Medicare is a "health care benefit program" as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

5. Medicare Part B pays for medically necessary outpatient medical services. Medicare authorizes payment for outpatient services if the care was actually provided and was medically necessary; that is, the services were required because of disease, disability, infirmity, or impairment. Medicare will not pay for services and treatment that were not actually provided or for which that patient did not meet the criteria necessary to justify the claimed service or treatment.

6. By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement, and furthermore, certified that they would not knowingly present, or cause to be presented, false and fraudulent claims. To participate as a Medicare provider and receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all of the provisions of the Social Security Act, the regulations promulgated under the

Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors.

7. Upon certification, the medical provider, whether a clinic or an individual, was assigned a provider identification number for Medicare billing purposes (referred to as an "NPI"). When the medical provider rendered a service, the provider submitted or caused the submission of a claim for reimbursement to the Medicare contractor or carrier that included the NPI assigned to that medical provider.

8. To receive reimbursement for a covered service from Medicare, a provider was required to submit a claim, either electronically or using a form (*e.g.*, a CMS-1500 form or UB-92) containing the required information appropriately identifying the provider, patient, and services rendered.

9. Health care providers were given, and provided with online access to, Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations. Providers could only submit claims to Medicare for services they rendered, and providers were required to maintain patient records to verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider. Among other things, the requirements included providing an accurate diagnosis and the nature of illness that was being treated.

10. Under the Social Security Act, for any item or service to be covered by Medicare, it must (1) be eligible for a defined Medicare benefit category, (2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed

body member, and (3) meet all other applicable Medicare statutory and regulatory requirements. *See* 42 U.S.C. § 1395y.

11. Medicare regulations require health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted or whose submission was caused by the physician. Medicare requires complete and accurate patient medical records so that Medicare may verify that the services described on the claim form were provided. These records are required to permit Medicare to review the appropriateness of Medicare payments made to the health care provider.

<u>The Federal Anti-Kickback Statute</u>

12. To enroll as a Medicare provider, Medicare required providers to abide by Medicare laws, regulations, and program instructions. Medicare further required providers to certify that they understood that a payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Accordingly, Medicare would not pay claims procured through kickbacks and bribes.

<u>Transcranial Doppler Ultrasound Tests</u>

13. A transcranial Doppler ultrasound ("TCD test") is a noninvasive diagnostic test that can be used to estimate the blood flow through certain blood vessels in the brain by bouncing high-frequency sound waves off blood cells.

14. Medicare has specific requirements to reimburse for TCD scans, which Medicare contractors have set forth in Local Coverage Determinations ("LCDs") for non-invasive vascular studies.

15. Non-invasive vascular studies are medically unnecessary unless (1) significant signs/symptoms of arterial or venous disease are present; (2) the information is necessary for appropriate medical and/or surgical management; and/or (3) the test is not redundant of other diagnostic procedures that must be performed. In addition, TCD scans are medically unnecessary if the outcome will not potentially impact the clinical course of the patient, meaning that if the doctor's course of treatment will not be impacted by the outcome of the test, a TCD scan is medically unnecessary.

16. LCD 27355, which was applicable in Connecticut and Massachusetts, among other states, to services performed between April 2014 through September 2015, sets forth only eight medical reasons for which Medicare will pay for TCD scans, which can include Healthcare Common Procedure Coding System ("HCPCS") procedure codes 93886 (Transcranial Doppler study of the intracranial arteries; complete), 93890 (vasoreactivity study), and 93892 (emboli detection without intravenous microbubble injection).[1] These medical reasons are generally limited to suspected or actual significant blockages of the blood vessels in the brain, blood flow for patients with suspected brain death or undergoing certain operations, and conditions relating to aneurysms in the brain. These diagnoses generally include neurovascular conditions such as cerebral infarctions due to embolisms, brain death, vertebro-basilar artery syndrome (or vertebro-

[1] LCD 27355 was replaced by LCD 33627 to reflect an updated version of the national reference for diagnostic codes. The coverage criteria for TCD tests generally did not change.

basilar artery insufficiency) ("VBI"), or occlusion or stenosis of cerebral arteries, as well as conditions relating to sickle-cell disease.[2]

17. Federal regulations require that diagnostic tests may only be ordered by the physician who treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. 42 C.F.R. § 410.32(a). Tests ordered by the physician who is not treating the beneficiary are not reasonable and necessary.

18. Medicare only covers a limited set of preventative services, which, in the context of diagnostic tests, are commonly referred to as screening tests. The screening tests permitted under Medicare's rules, regulations, policies, and procedures do not include TCD tests.

19. The Medicare LCDs pertinent to TCD tests generally set forth specific clinical uses for TCD tests that are considered reasonable and necessary as well as specific instances when TCD tests are considered not medically necessary or reasonable.

20. Private insurance companies' coverage criteria are generally similar to those contained in the Medicare LCDs.

Overview of the Health Care Fraud Conspiracy

21. From in or about April 2014 to in or about June 2019, SALZBERG and CC-1, together with others known and unknown, devised and executed a scheme to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b),

[2] VBI is a condition characterized by poor blood flow to the vertebral and basilar arteries in the rear portion of the brain. Symptoms of VBI include loss of vision in one or both eyes; double vision; dizziness (vertigo); numbness or tingling in the hands or feet; nausea and vomiting; slurred speech; changes in mental status, including confusion; sudden, severe weakness throughout the body, called drop attack; loss of balance and coordination; and difficulty swallowing.

and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, by causing the submission of materially false and fraudulent claims.

Object and Purpose of the Healthcare Fraud Conspiracy

22. The object and purpose of the conspiracy was for SALZBERG and CC-1 to unlawfully enrich themselves and others and to defraud health insurance plans of money by falsifying patient diagnoses when ordering unnecessary medical testing, and thereby causing the submission of materially false and fraudulent claims for those services to be submitted in exchange for kickbacks.

Manner and Means of the Healthcare Fraud Conspiracy

23. The manner and means by which SALZBERG, and coconspirators known and unknown, carried out the conspiracy and the scheme to defraud were the following:

a. Ordering TCD tests that were not medically necessary;

b. Falsifying patient diagnoses when ordering the TCD tests to cause Medicare and private insurance companies to pay for the testing;

c. Soliciting and receiving cash and check kickback payments in exchange for ordering the TCD tests;

d. Billing Medicare and private insurance companies for approximately $3.25 million in fraudulent claims; and

e. Paying and receiving approximately $148,000 in kickbacks.

Acts in Furtherance of the Healthcare Fraud Conspiracy

24. Beginning in or about April 2014, SALZBERG entered into an agreement with CC-1 in which he agreed to refer patients for TCD testing using false diagnoses in exchange for approximately $100 to $125 in cash for each patient referred for the testing. He also received check payments purportedly for rent and administrative services that were designed to make the kickback arrangement appear to be legitimate.

25. SALZBERG signed hundreds of orders for medically unnecessary TCD tests using false diagnoses in order to cause Medicare and private insurance companies to pay for the testing.

26. SALZBERG and others known and unknown carried out the following acts in furtherance of the healthcare fraud conspiracy and scheme to defraud:

a. On or about January 22, 2015, CC-1 emailed SALZBERG and others, directing them to use the VBI diagnosis on the TCD test order forms.

b. On or about November 7, 2016, SALZBERG signed a TCD order form for Patient 1 falsely stating that Patient 1 had VBI.

c. On or about February 7, 2017, SALZBERG signed a TCD order on his prescription pad for Patient 2 that falsely contained the diagnosis code for VBI.

d. On or about August 15, 2017, SALZBERG signed a TCD order on his prescription pad for Patient 3 that falsely contained the diagnosis code for VBI.

Overview of the Conspiracy to Pay and Receive Kickbacks

27. From in or about April 2014 to in or about June 2019, SALZBERG, CC-1, and coconspirators known and unknown conspired to offer, pay, solicit, and receive, and did offer, pay, solicit, and receive kickbacks for ordering medically unnecessary diagnostic tests.

Object and Purpose of the Kickback Conspiracy

28. The object of the conspiracy was to offer, pay, solicit, and receive kickbacks in connection with the referral of patients for TCD testing reimbursed in whole or in part by Medicare. The principal purpose of the conspiracy was to offer, pay, solicit, and receive kickbacks to generate referrals of medically unnecessary tests to enrich themselves and others, known and unknown.

Manner and Means of the Kickback Conspiracy

29. Among the manner and means by which SALZBERG, CC-1, and coconspirators known and unknown carried out the conspiracy were the following:

a. Receiving kickbacks in cash and check from CC-1 generally every month based on the number of patients referred for TCD testing the prior month;

b. Text messaging with CC-1 concerning the calculation and payment of kickbacks;

c. Including false diagnoses on the orders for the TCD testing so that Medicare was misled into believing that the patients fit the coverage criteria for TCD testing.

Overt Acts in Furtherance of the Kickback Conspiracy

30. From in or about April 2014 through in or about June 2019, SALZBERG, CC-1 and coconspirators known and unknown committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

a. On or about December 19, 2014, SALZBERG and CC-1 met and CC-1 gave SALZBERG a cash payment for TCD tests that SALZBERG ordered through TCD Company.

b. On or about March 10, 2015, SALZBERG and CC-1 met and CC-1 gave SALZBERG a cash payment based on the number of TCD tests that SALZBERG ordered through TCD Company.

c. On or about October 14, 2015, SALZBERG and CC-1 met in the parking lot of an eye surgery center and CC-1 gave SALZBERG a cash payment based on the number of TCD tests that SALZBERG ordered through TCD Company.

d. In or about March 2016, SALZBERG and CC-1 exchanged text messages about the calculation of SALZBERG's payment for TCD tests that SALZBERG ordered through TCD Company.

e. In or about April 2016, Medicare contractors visited SALZBERG's office in West Hartford, Connecticut and asked SALZBERG about his payment arrangement with TCD Company. SALZBERG falsely stated that he received a flat fee per month that was not based on the number of TCD tests that he ordered.

f. On or about May 9, 2016, SALZBERG and CC-1 exchanged text messages arranging to meet in the parking lot of a shopping center in West Hartford, Connecticut, where CC-1 gave SALZBERG a cash payment based on the number of TCD tests that SALZBERG ordered through TCD Company.

g. On or about August 15, 2017, SALZBERG signed a TCD order on his prescription pad for Patient 3 that falsely contained the diagnosis code for VBI.

COUNT ONE
Conspiracy to Commit Health Care Fraud
(18 U.S.C. § 1349)

The United States Attorney charges that:

31. The United States re-alleges and incorporates by reference paragraphs 1-29.

32. From in or about April 2014 to in or about June 2019, in the District of Massachusetts and elsewhere, the defendant,

DONALD SALZBERG,

conspired with others known and unknown to the United States to commit health care fraud, that is, to knowingly execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain moneys, funds, credits, assets, securities and other property owned by and under the custody and control health care benefit programs, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO
Conspiracy to Pay and Receive Kickbacks
(U.S.C. § 371)

The United States Attorney further charges that:

33. The United States re-alleges and incorporates by reference paragraphs 1-29 of this Indictment.

34. From in or about April 2014 to in or about June 2019, in the District of Massachusetts and elsewhere, the defendant,

DONALD SALZBERG,

conspired with others known and unknown to the United States to commit an offense against the United States, that is, to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks, to induce the referral of patients for items and services, for which payment may be made in whole and in part by a federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b).

All in violation of Title 18, United States Code, Sections 371.

FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

35. Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 1349 and 371, set forth in Counts One and Two, the defendant,

DONALD SALZBERG

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses. The property to be forfeited includes, but is not limited to, the following:

a. $148,730, to be entered in the form of an Order of Forfeiture (Money Judgment); and

b. $84,210 in United States currency turned over to Health and Human Services, Office of Inspector General in July 2019.

36. If any of the property described in Paragraph 35, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendants –

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 36 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

RACHAEL S. ROLLINS
United States Attorney

By: [signature]
RACHEL Y. HEMANI
HOWARD LOCKER
Assistant U.S. Attorneys

Date: May 23, 2022